UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DAVID CLARY,                          )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )          Case No. 1:14-CV-125-CEJ
                                      )
CITY OF CAPE GIRARDEAU, MISSOURI      )
and MATTHEW PETERS,                   )
                                      )
          Defendants.                 )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on the parties' cross-motions for summary judgment, pursuant to Fed. R. Civ. P. 56(a). The issues are fully briefed.

Plaintiff David Clary brings this action pursuant to 42 U.S.C. § 1983, claiming that the defendants violated his First Amendment right to freedom of speech. The defendants are the City of Cape Girardeau, Missouri (the "City") and Matthew Peters, one of the City's police officers, who is sued only in his individual capacity.

### I.   Background

#### A. The traffic stop and arrest

On the morning of August 30, 2013, plaintiff was driving his truck in the City when he made an illegal right turn at an intersection.  Peters, who was in a marked police car, saw plaintiff make the illegal turn and decided to initiate a traffic stop. Peters turned on the police car's emergency lights, signaling plaintiff to pull over.

The parties dispute where the traffic stop occurred.  According to defendants, plaintiff drove onto the parking lot of a battery store and the traffic stop occurred there.  Plaintiff maintains that he pulled over on the public street adjacent to the

battery store.  Because it does not affect the outcome, the Court will assume that the stop occurred on a private parking lot.

After plaintiff stopped his truck, Peters parked his police car behind it.  The parties also dispute whether Peters parked five feet from the rear of plaintiff's truck or a full car-length away.  Regardless, neither party contends that the distance between the vehicles or between plaintiff and Peters was ever fifty feet or more. Once stopped, plaintiff and Peters exited their respective vehicles.  Peters instructed plaintiff to get back into his truck, and plaintiff complied.  Peters then approached and told plaintiff that he was being stopped for making an illegal right turn.

In response to Peters' request, plaintiff produced his driver's license and vehicle registration, both of which were valid.  Peters returned to the police car where he verified plaintiff's documentation and prepared a citation and a summons for the illegal right turn.  When Peters returned to the truck, he told plaintiff that a citation was being issued for the traffic violation.  He also told plaintiff that he could either plead guilty by mail and pay a fine or dispute the citation by appearing in court on the date listed on the summons.  Plaintiff signed the citation and acknowledged receipt of the summons.

Plaintiff then told Peters that he intended to appear in court to challenge the citation, because it was "crap."  He also said that the citation was "bullshit" and called Peters a "dick."  Peters responded, "I'm sorry."  Plaintiff then again called Peters a "dick."  Peters asked plaintiff why he had said that, and plaintiff replied to the effect that Peters had been a "dick" from the moment he first exited the police

car.  Peters handed plaintiff the citation, told plaintiff to "drive safely" and to "have a nice day," and walked back to his police car.

After Peters walked back to his police car, plaintiff told him to "go fuck" himself.  When Peters asked plaintiff what he had said, plaintiff replied, "fuck off."  The parties disagree about whether or not plaintiff yelled the profanity.  Because it does not affect the outcome, the Court will accept defendants' contention that he did.  According to defendants, after plaintiff began yelling approximately ten people exited a pool store that was located across a four-lane street and more than 100 feet from the scene and watched the encounter.  Defendants also contend that a man also exited the battery store and began watching.  Plaintiff does not concede that anyone came out the pool store; he asserts that one person came out of the battery store only after he had stopped yelling.

In response to the profanity, Peters told plaintiff, "[I]f I can hear your voice over 50 feet, I'm going to take you to jail."  Pl. Dep. 14:19–20.  Peters then reiterated his intention to arrest plaintiff if he continued to yell.  Plaintiff responded that Peters should either "do it or shut the fuck up."  Peters then walked back to plaintiff's truck and told him to exit the vehicle.  Plaintiff complied and was handcuffed.  Plaintiff was arrested for violating § 17-157(a)(9) of the Cape Girardeau Code of Ordinances, not for the illegal right turn.

According to defendants, Peters arrested plaintiff because "people [came] out of the business[es] . . . plus the level of [plaintiff's] voice[.]"  [Doc. #22 at 5]  However, despite the City's policy that an officer should record witnesses to a violation of the ordinance when those witnesses are identifiable, Peters did not do so.  Peters did not interview or attempt to interview any witnesses or alleged

victims either before or after the arrest.  He spoke to the person who had exited the battery retailer, but only to obtain permission to leave plaintiff's truck on the parking lot while he took plaintiff to the police station.

Peters acknowledges that his only evidence that anyone was disturbed by plaintiff's conduct was the fact that people exited the two stores and watched the encounter.  Peters Dep. 31:1–5 (exiting the stores was "a sign of them being disturbed").  Peters testified in his deposition that had any of these individuals reported being disturbed by the profanity, then plaintiff would have been guilty of peace disturbance, which is covered by a different ordinance.  *Id.* at 18:19–24.  Peters further admitted that he would not normally obtain the names of witnesses or victims for "something like this," because the "victim" is the "general population." *Id.* at 19:3–17.

Plaintiff was taken to the police station where he was fingerprinted and photographed.  He was detained there for approximately one hour.

After a bench trial in the City's municipal court, plaintiff was found guilty of making an illegal right turn for which he was assessed a fine and court costs.  He was found not guilty of violating Ordinance 17-157(a)(9).

### B.  The ordinance

Ordinance § 17-157 prohibits certain categories of noise-producing activity, such as broadcasting electronically amplified music at night without a permit in a residential area.  The parties agree that no court in Missouri has ever had cause to interpret § 17-157.  The plaintiff was charged and acquitted of violating § 17-157(a)(9) (the "Ordinance"), which provides as follows:

> (a)  *In general.*  No person shall make, continue, or cause to be made or continued, or allow anyone or anything under his control to make or

cause, any noise disturbance. Noncommercial public speaking and public assembly activities conducted on any public space or public right-of-way and otherwise complying with this Code of Ordinances shall be exempt from the operation of this section. The following acts, among others not herein listed, and the causing thereof, are declared to be in violation of this article, but said enumeration shall not be deemed to be exclusive, namely:

* * *

(9) Yelling, shouting, hooting, whistling or singing on any public street, particularly between the hours of 11:00 p.m. and 6:00 a.m., or at any time or place so as to annoy, disturb the quiet, comfort or repose of persons in any office, or in any dwelling, hotel or other type of residence, or of any persons in the vicinity[.]

*Cape Girardeau Code of Ordinances* § 17-157(a)(9).

Unlike other sections of § 17-157, subsection (a)(9) does not specify at what distance from the source of the yelling, shouting, hooting, whistling, or singing a sound must be audible to constitute a violation. Further, the Ordinance does not define "yelling," "shouting," "hooting," "whistling," "singing," "annoy," "disturb," "quiet," "comfort," "repose," or "vicinity." Defendants contend that the only two factors that determine whether a person has committed a violation are: (1) the "level of [that person's] voice" and (2) whether that sound "disturb[s]" "[s]omeone in [a] business." [Doc. #22 at 5] Nevertheless, defendants concede that the Ordinance plainly forbids "annoy[ing]" or "disturb[ing]" anyone in any "dwelling, hotel or other type of residence" or "annoy[ing]" or "disturb[ing]" "any persons in the vicinity[.]"

The City has an unwritten policy that its police officers have "discretion to decide" based on their "common sense" whether a person's yelling, shouting, hooting, whistling, or singing is violative of the Ordinance. Barker Dep. 10:14–16, 12:15–18. Further, the City interprets the Ordinance to mean that an individual

may be guilty of a violation even in the absence of a non-officer complainant. *Id.* at 10:6–16. That is to say, a police officer can be the complainant if the officer is himself annoyed or disturbed by a person's yelling, shouting, hooting, whistling, or singing, provided that the officer can hear the sound at a distance of at least fifty feet. *Id.* at 22:4–10.

Peters interprets the Ordinance to mean that he may arrest someone for yelling, shouting, hooting, whistling, or singing that "disturb[s] [a] business[]," even if the businessperson who is disturbed is a mere five feet from the source of the sound. Peters Dep. 21:11–25, 24:4–10. By way of example, though Peters' common sense tells him that "normal speech" "probably" would not disturb a business, he believes that a person yelling political slogans in favor of a particular candidate for office would be guilty of violating the Ordinance if yelling the slogans disturbed anyone's business. *Id.* at 24:4–10, 35:15–25, 36:1–5.

Peters further explained that the Ordinance operates "kind of like a peace disturbance," except that "if there's a peace disturbance, you will have a victim who will actually sign a piece of paper." *Id.* at 22:7–22. In contrast, the City's police officers can "be a little more proactive" and can charge individuals with violating the Ordinance in situations where the person allegedly annoyed or disturbed wants to "end the problem without having to identify themselves," provided the officer hears the purportedly offensive sound. *Id.* at 22:7–22, 29:7–21.

In addition to granting its police officers discretion to determine when a violation has occurred, the City's unwritten policy further provides that an officer has the "discretion" to decide whether to arrest an individual for violating the Ordinance or to just issue a citation. Barker Dep. 14:23–15:3. In deciding how to

exercise this discretion, an officer considers the following factors: (1) whether the violator refuses to sign the citation, (2) whether the officer has had prior contacts with the violator and has "knowledge of whether" the violator is "likely to appear in court or not," and (3) the officer's perception of the violator's "demeanor" and "attitude toward the officer." *Id.* at 15:4–17:5. None of these factors is listed in the Ordinance.

## II.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.    Discussion

Plaintiff first claims that Peters retaliated against him for exercising his First Amendment right to freedom of speech (Count I). Plaintiff also claims that the City failed to train Peters regarding the rights protected by the First Amendment and that the City failed to adequately supervise Peters to prevent infringement of those rights (Count II). Plaintiff additionally seeks a declaration that § 17-157 in its entirety is unconstitutional on its face (Count III) and as applied to him (Count IV), and that the Ordinance is void for vagueness (Count V).

### A.  Void for Vagueness

The parties have focused their summary judgment motions on § 17-157(a)(9) and have not addressed the other provisions of § 17-157. The City bears the burden of proving that the Ordinance does not violate plaintiff's First Amendment right to free speech, because "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000); *see Phelps-Roper v. Koster*, 713 F.3d 942, 949 (8th Cir. 2013) (same). But because defendants are opposing summary judgment on plaintiff's void-for-vagueness claim, the Court is required to view the facts in the light most favorable to them on that claim. *Farrow*, 826 F.2d at 734.

### (1)  Legal Standard

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. It requires the invalidation of laws that are impermissibly vague." *Id.* (citation omitted); *see Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). The Supreme Court has explained:

> Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.

*Fox Television Stations, Inc.*, 132 S. Ct. at 2317 (citing *Grayned*, 408 U.S. at 108–09); *see City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Put another way, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09.

The Due Process Clause's proscription against vague regulations is stronger still when the regulation in question implicates the First Amendment. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television Stations, Inc.*, 132 S. Ct. at 2317. That is so because "[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or controversial beliefs." *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012).

In *Fox Television Stations, Inc.*, the Supreme Court wrote: "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" 132 S. Ct. at 2317 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id.* (citing *Williams*, 553 U.S. at 306).

The "plain meaning of the text controls, and the legislature's specific motivation for passing a law is not relevant," when deciding whether a regulation fails to provide fair notice of what is prohibited or authorizes or encourages seriously discriminatory enforcement. *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 688 (8th Cir. 2012) (en banc) (quotation marks and citation omitted). Words "should be read according to their ordinary meaning." *United States v. Stevens*, 559 U.S. 460, 474–75 (2010). The text standing alone is not the only source from which to derive the ordinary meaning of the words, however. "The inherent uncertainty of language often will impart some degree of vagueness to a statute, but that uncertainty alone does not mean that a statute is unconstitutional. Recourse to additional sources like dictionaries or judicial opinions may provide sufficient warning." *Neely v. McDaniel*, 677 F.3d 346, 350 (8th Cir. 2012). Another analytical tool in the plain-text analysis is "the commonsense canon of *noscitur a sociis*," by which "an ambiguous term may be given more precise content by the neighboring words with which it is associated" and "an unclear definitional phrase may take meaning from the term to be defined . . . ." *Stevens*, 559 U.S. at 475.

In addition, "'[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)). Here, no state court has interpreted the Ordinance. Thus, the Court is left with the limiting construction proffered by the City and Peters, the enforcing agents. However, a narrowed reading of the plain text is distinct from a policy of limited enforcement or prosecutorial discretion. For "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480. A court cannot "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.*

### (2) Evaluation of Ordinance for Vagueness

The Ordinance bans the following: "Yelling, shouting, hooting, whistling or singing . . . at any time or place so as to annoy, disturb the quiet, comfort or repose of . . . any persons in the vicinity." The Ordinance does not define "yelling," "shouting," "hooting," "whistling," "singing," "annoy," "disturb," "quiet," "comfort," "repose," or "vicinity."

The Supreme Court has held that "singing . . . whistling, shouting, [and] yelling" are forms of speech protected by the First Amendment. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 772 (1994); *see also Ward*, 491 U.S. at 790 ("Music, as a form of expression and communication, is protected under the First Amendment."). No party has disputed, and the Court is confident, that "hooting," however defined, enjoys the same protection. *See Virginia v. Black*, 538

U.S. 343, 358 (2003) ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.")

### (a)  Manner of Communication

Government has the power to regulate yelling, shouting, hooting, whistling, or singing—*i.e.*, the manner of communication—and the time and place thereof only if its regulations are: (1) "content and viewpoint neutral," *Veneklase v. City of Fargo*, 248 F.3d 738, 744 (8th Cir. 2001) (en banc); (2) "narrowly tailored to serve a significant government interest"; and (3) "allow for ample alternative channels for communication." *Koster*, 713 F.3d at 950 (quotation marks and citations omitted). "[T]he requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent regulation," provided that it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799 (quotation marks and citations omitted).[1]

As applied to "noise restrictions," a time, place, and manner regulation may be justified based on the volume of noise produced at a particular place and time, because "the nature of a place, the pattern of its normal activities, dictate the kinds of regulations . . . that are reasonable." *Madsen*, 512 U.S. at 772 (quotation marks and citations omitted); *see id.* at 772–73 (upholding regulation of excessive noise and protests around medical facilities); *Ward*, 491 U.S. at 796 (holding that

---

[1]     The Ordinance also criminalizes annoying or disturbing speech on *private* property (e.*g.*, the battery store's parking lot).  Although it is disputed whether plaintiff was stopped on private property or on a public street at the time he violated the Ordinance, neither party has addressed the question of whether the City may forbid an individual poised on private property—including in his or her own house—from annoying or disturbing another person on that property or elsewhere.  That question, however, warrants no further discussion, because the Court concludes that the Ordinance is unconstitutionally vague regardless of where the speaker is located.

"government may act to protect . . . traditional public forums as city streets and parks from excessive noise"); *Frisby v. Schultz*, 487 U.S. 474, 484, 487 (1988) (recognizing that government may restrict noise that invades "the well-being, tranquility, and privacy of the home" to protect the "captive" audience that "cannot avoid the objectionable speech"); *Grayned*, 408 U.S. at 120 (upholding a regulation meant to prevent disruptions to schools during the school day); *id.* at 116 (recognizing bans on "overamplified loudspeakers"); *City of Manchester*, 697 F.3d at 691–92 (shielding funeral services from excessive noise and protests).

Some imprecision is undoubtedly involved when deciding whether a vocalization constitutes yelling or shouting, as opposed to mere talking. So, too, when distinguishing between mere noise and hooting, whistling, or singing. In this case, the constitutionally-protected manner of communication the Ordinance regulates is sufficiently defined such that an ordinary person would understand what activity is proscribed. Further, the fact that the City decided to regulate certain manners of expression without defining those terms does not in itself authorize or encourage seriously arbitrary enforcement.

### (b) Time and Place of Communication

The Ordinance also clearly delineates the times and places where yelling, shouting, hooting, whistling, or singing might be criminal. Those forms of speech are potentially forbidden at *any* place and at *any* time (provided that the speaker is also annoying or disturbing, as discussed below). A person of ordinary intelligence would have no trouble understanding the Ordinance's categorical ban on certain forms of speech everywhere, all of the time. Moreover, such sweeping regulation does not authorize or encourage seriously discriminatory enforcement, any more

than categorical bans on driving in excess of the speed limit or the use of controlled substances at all places and times necessarily means that some offenders will be caught and others will not. Thus, a prohibition on whistling at any place and at any time is not vague.

But plainly a regulation categorically banning all of those forms of unamplified speech at any place and time would be, at minimum, unconstitutional on its face under the overbreadth doctrine. *See Stevens*, 559 U.S. at 473 ("[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" (quoting *Grange*, 552 U.S. at 449 n.6)); *Morales*, 527 U.S. at 52; *Grayned*, 408 U.S. at 114–15 ("The crucial question . . . is whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."); *see also Kovacs v. Cooper*, 336 U.S. 77, 81–82 (1949) (remarking, in dicta, that the "[a]bsolute prohibition within municipal limits of all sound *amplification*, even though reasonably regulated in place, time and volume, is undesirable and *probably* unconstitutional as an unreasonable interference with normal activities" (emphasis added)).

Further, the City's interpretation of "vicinity" as encompassing only those forms of speech audible fifty feet or more from the speaker does not cure the constitutional defect. Even if the Ordinance criminalized, for example, only singing or whistling that was audible over fifty feet from the speaker at all places and at all times, the Ordinance would still be either unconstitutionally overbroad on its face or unconstitutional as a time, place, and manner restriction that is not narrowly tailored. *See Stevens*, 559 U.S. at 473; *Deegan v. City of Ithaca*, 444 F.3d 135,

140 (2d Cir. 2006) (holding that a noise ordinance that, as interpreted by a municipality, restricted "any noise—anywhere in the city at any time of the day or night—if it *can be heard* 25 feet away" was not a narrowly tailored time, place, and manner restriction and was thus unconstitutional (quotation marks and citation omitted)); *United States v. Doe*, 968 F.2d 86, 90 (D.C. Cir. 1992) (striking down as unconstitutional a noise ordinance that banned sound in excess of 60 decibels at 50 feet).

Thus, if the Ordinance forbids yelling, shouting, hooting, whistling, and singing at all places and at all times wherever audible at a distance of fifty feet or more without an additional element to distinguish the licit from the illicit, the Court would have to conclude that the Ordinance was unconstitutional. The Ordinance consequently survives or falls on the particular circumstances in which conduct— that is, forms of speech audible anywhere, at any time, from fifty feet or more— transforms into an actual crime. The Court need not remark further on the sweeping times and places where the Ordinance *might* criminalize protected speech, because the vague circumstances in which the Ordinance *does* criminalize protected speech are fatal.

### (c) Annoying or Disturbing Third Parties

The Ordinance fails to put a person of ordinary intelligence on notice of when his regulated forms of speech at any place and time actually violate the law, and it also authorizes and encourages seriously discriminatory enforcement. The operative words are "annoy" and "disturb the quiet, comfort or repose," by which yelling, shouting, hooting, whistling, or singing at any time or place in the City becomes criminal. Again, these terms are not defined, nor has any state court

been called upon to examine the Ordinance to determine their meaning.  *Cf. Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine [of vagueness] demands a greater degree of specificity than in other contexts.").

Courts have found that the meaning of "annoy" is not so apparent that an ordinary person would be on notice of what constitutes a violation.  *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), is instructive.  In *Coates*, the Supreme Court struck down an ordinance as void for vagueness where it prohibited "conduct . . . annoying to persons passing by."  *Id.* at 612.  The Supreme Court explained that, "'annoying' is a widely used and well understood word," so the term "annoy" is not vague.  *Id.*  The Court found, however, that "[c]onduct that annoys some people does not annoy others," and, therefore, "no standard of conduct is specified at all," such that "men of common intelligence must necessarily guess at its meaning."  *Id.* (quotation marks and citations omitted).  *Coates* held:

> The city is free to prevent people from . . . engaging in countless . . . forms of antisocial conduct.  It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. . . .  It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed.

*Id.* (citation omitted).  Further underscoring its rationale, the Supreme Court addressed the inevitable chilling effect that vague regulations have on speech:

> The First and Fourteenth Amendments do not permit a State to make criminal the exercise of [free speech] simply because its exercise may be "annoying" to some people.  If this were not the rule, the right of the people to [speak] would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct.  And such a prohibition, in addition,

contains an obvious invitation to discriminatory enforcement against those whose [speech] is "annoying" because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.

*Id.* at 615–16; *see also Cohen v. California*, 403 U.S. 15, 21, 25 (1971) ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." (citations omitted)).

Precedent also forecloses interpreting the undefined phrase "disturb the quiet, comfort or repose" as anything other than a vague prohibition that "authorizes or encourages seriously discriminatory enforcement." *Fox Television Stations, Inc.*, 132 S. Ct. at 2317. In *Cox v. Louisiana*, 379 U.S. 536 (1965), the Supreme Court struck down as unconstitutionally vague a statute that defined a "'breach of the peace' as actions with a tendency 'to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet.'" *Id.* at 551 (citation omitted). The Court reasoned that such a "definition[] would allow persons to be punished merely for peacefully expressing unpopular views." *Id.*; *see Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) ("[D]isgust is not a valid basis for restricting expression."); *Goguen*, 415 U.S. at 573 ("[W]hat is contemptuous to one man may be a work of art to another.").

The Ordinance makes no distinction between speech that disturbs the quiet, comfort, or repose of the hearer because of its volume and that which disturbs because of its subjective offensiveness. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2531–32 (2014) (explaining that a statute "would not be content neutral if it were concerned with undesirable effects that arise from the direct impact of speech on its

audience or listeners' reactions to speech").  Under the Ordinance, a too-loud sound and a subjectively offensive sound are treated equally as a noise disturbance and, leaving the speaker to guess what sounds may disturb his fellow citizens. Inevitably such a regulation will have a chilling effect on speech, and the Ordinance therefore violates due process.  *Joyce*, 779 F.3d at 789 ("[T]he right to free speech 'includes the right to attempt to persuade others to change their views' which 'may not be curtailed simply because the speaker's message may be offensive to his audience.'"  (quoting *Hill v. Colorado*, 530 U.S. 703, 716 (2000)); *see Grayned*, 408 U.S. at 117–18 ("[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression . . . .  Expressive activity [can] certainly be restricted, but only if the forbidden conduct materially disrupts [a captive audience] or involves substantial disorder or invasion of the rights of others."  (quotation marks and citation omitted)); *Street v. New York*, 394 U.S. 576, 592 (1969) ("[U]nder our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Terminiello v. City of Chicago*, 337 U.S. 1, 3 (1949) (reversing a conviction for "breach of the peace" where that crime was defined so as to punish speech that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or . . . molests the inhabitants in the enjoyment of peace and quiet by arousing alarm"); *see also Joyce*, 779 F.3d at 790 (citing *Texas v. Johnson*, 491 U.S. 397, 407–08, 414 (1989), and explaining that "[d]isagreement with a message does not permit its suppression"); *City of Manchester*, 697 F.3d at 686.

Moreover, that the Ordinance criminalizes speech that annoys or disturbs any third party without defining those terms means that an individual can avoid a criminal charge only by never yelling, shouting, hooting, whistling, or singing anywhere, at any time. In *Stahl*, the Eighth Circuit found a municipal ordinance void for vagueness where the ordinance did "not provide people with fair notice of when their actions are likely to become unlawful." 687 F.3d at 1041–42. That ordinance "criminalize[d] speech if it ha[d] the consequence of obstructing traffic, but the speaker [did] not know if his or her speech [was] criminal until after such an obstruction occur[red.]" *Id.* The Eighth Circuit struck down the ordinance because it "criminalize[d] activity based primarily on often unpredictable reactions of third parties rather than directly on a person's own actions." *Id.*

The Ordinance here suffers from the same problem, for the speaker has been given no meaningful standard to determine whether his speech is disruptive before he speaks. The speaker learns that he has disturbed others nearby only after yelling, shouting, hooting, whistling, or singing, at which point he has already committed the crime. Such a prohibition again has the inevitable effect of chilling protected speech, for to avoid committing a crime, the speaker must err on the side of caution and never yell, shout, hoot, whistle, or sing within the City limits.

Additionally, due to the absence of any definition there is a conflation of prohibited and permitted conduct. Thus, the Ordinance contains no mens rea requirement: it matters not whether the hooter, singer, or whistler intends to offend, only that a third-party, the victim, is annoyed or disturbed. In *Morales*, the Supreme Court explained that a criminal law may be vague if it "contains no *mens rea* requirement," because such a law permits a state to punish the offender based

solely on third-parties' reactions to his conduct. 527 U.S. at 55; *see Grayned*, 408 U.S. at 113–14. Applying the same standard, the Eighth Circuit found the ordinance at issue in *Stahl* void for vagueness because a "violation of the ordinance does not hinge on the state of mind of the potential violator, but the reaction of third parties." 687 F.3d at 1041–42 (citing *Morales*, 527 U.S. at 55). That the Ordinance here subjects a speaker to criminal liability solely based on third-parties' subjective annoyance or disturbance, without a requirement that the City prove any scienter, also compels the conclusion that the Ordinance is void for vagueness.

Further, defendants offer no official policy or unofficial interpretation that would explain to a person of ordinary intelligence how to shape his conduct to avoid annoying or disturbing the quiet, comfort, or repose of all persons fifty feet or more from him at all times. The determination of what separates annoyance and disturbance from innocent conduct is made by a police officer based on his "common sense." Even when the officer is not the complainant, he need not interview or even identify the "victims," for all that matters is that his "common sense" tells him that the people he observed more than fifty feet away were annoyed or disturbed by the speech.

Vesting law enforcement officials with complete discretion to decide whether a violation has occurred is the hallmark of a vague regulation. As the Supreme Court wrote in *Kolender v. Lawson*, 461 U.S. 352 (1983), a statute that accords to police "the full discretion . . . to determine" whether a violation has occurred "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat[,] . . . furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their

displeasure[,] . . . and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Id.* at 357–58, 360–61 (quotation marks and citations omitted). "Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities for setting the standards of the criminal law." *Goguen*, 415 U.S. at 575.

> It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or . . . the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.

*Cox*, 379 U.S. at 557–58.

These long-standing precedents establish that the Constitution does not permit the arbitrary criminalization of conduct that the defendants' "common sense" standard sanctions.

Finally, the following examples illustrate why the Ordinance is unconstitutionally vague, both as written and as interpreted by defendants:

- A concertgoer who whistles or yells to draw her friend's attention from across a crowded private parking lot could be arrested if anyone fifty feet or more away found that sound annoying or disturbing.

- The sports fan in one of the City's taverns who makes the mistake of hooting with glee at a Cubs' victory might find himself jailed for drawing the ire of a despondent Cardinals fan across the bar.

- The Stentor who attempts to achieve a world record by shouting unamplified at 125 decibels is in no trouble if the onlookers to the sonorous feat are all impressed. Contrariwise, if the same person whistles a few notes from *America the Beautiful* at a low volume, he has broken the law if one person fifty feet away is annoyed or disturbed.

- A veteran who, while standing in her back yard next to a flagpole on the Fourth of July, begins to sing the *Star-Spangled Banner* slightly off-key could find herself arrested if a police officer patrolling nearby hears the song and is annoyed or disturbed by the imperfect rendition of America's national anthem.

### (3)  Severability

"[A]mbiguous statutory language should be construed to avoid serious constitutional doubts."  *Stevens*, 559 U.S. at 481 (quotation marks and citation omitted).  To give effect to that canon of avoidance, a court must "look to state law to determine the severability of a state statute."  *Koster*, 713 F.3d at 953.  As the Eighth Circuit explained in *Koster*:

> Missouri law requires courts to sever unconstitutional provisions of statutes and give effect to the remaining statutory text unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

*Id.* (citing Mo. Rev. Stat. § 1.140, and quoting *Gen. Motors Corp. v. Dir. of Revenue*, 981 S.W.2d 561, 568 (Mo. 1998) (en banc), which held that "[s]tatutes are presumptively severable" and "should be upheld to the fullest extent possible").

However, a court "'may impose a limiting construction on a statute only if it is "readily susceptible" to such a construction.'"  *Stevens*, 559 U.S. at 481 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884 (1997)).  A court cannot "rewrite a . . . law to conform it to constitutional requirements, . . . for doing so would constitute a serious invasion of the legislative domain . . . ."  *Id.* (quotation marks and citations omitted).  The distinction between severance and redrafting hinges on whether the regulation in question is ambiguous as a result of the inclusion of "a void term" or the "failure to include further clarifying provisions."

*Koster*, 713 F.3d at 953.  A court faced with a regulation that cannot be cured by severing the provisions that make the regulation unconstitutional is not permitted to "insert terms" to cure the error, because courts "have an obligation to refrain from embellishing statutes by inserting language the legislature has opted to omit." *Id.* (quotation marks and citation omitted); *see also United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 432 (8th Cir. 1988) (holding that it is "beyond [the] power [of] a federal court to rewrite the broad, straightforward language of [a statute] to avoid the constitutional difficulties presented by the plain meaning of its terms").  Thus, the Court can at most excise ambiguous terms from the Ordinance, but it may not add words to clarify any ambiguity.

The Ordinance is rendered unconstitutionally vague by its inclusion of the undefined terms "annoy, disturb the quiet, comfort or repose" of a third party as an essential element of the crime.  Though the Court could strike the words "annoy" and "disturb the quiet, comfort or repose" from the Ordinance, it cannot add additional terms to clarify the meaning of those vague prohibitions.  With those terms excised, the Ordinance would prohibit the following:  "Yelling, shouting, hooting, whistling or singing . . . at any time or place."  For the reasons discussed above, however, such a categorical ban on particular forms of speech would be, at minimum, unconstitutionally overbroad.  *See Stevens*, 559 U.S. at 473; *Morales*, 527 U.S. at 52; *Grayned*, 408 U.S. at 114–15; *Kovacs*, 336 U.S. at 81–82.

Further, accepting the City's narrow reading of "vicinity" as imposing a proscription against certain sounds audible only at or over fifty feet, if the Court were to strike the vague terms, the Ordinance would still prohibit all yelling, shouting, hooting, whistling, or singing that was audible at or over fifty feet from a

speaker. Again, however, the Court would be compelled to conclude that such a regulation was unconstitutionally overbroad for criminalizing speech that sweeps far beyond the legitimate purpose of curtailing noise. *See Stevens*, 559 U.S. at 473; *Deegan*, 444 F.3d at 140; *Doe*, 968 F.2d at 90.

Even a further limiting construction would necessitate the same result. If the Court were to strike all of the terms that depend upon the vague terms "annoy" and "disturb" (*e.g.*, persons in dwellings, hotels, offices, and the like) and the terms by which the Ordinance applies to all times and places, the Ordinance would then only forbid "yelling, shouting, hooting, whistling or singing on any public street between the hours of 11:00 p.m. and 6:00 a.m." Such a construction would render the Ordinance "incapable of being executed in accordance with the legislative intent," *Koster*, 713 F.3d at 953, because the Ordinance explicitly exempts from regulation noncommercial speech on a public street. Thus, no construction of the Ordinance in which the vague terms are excised would pass constitutional muster.

For those reasons, the Court will grant summary judgment in favor of plaintiff and against the City on plaintiff's claim in Count V that the Ordinance is void for vagueness. Plaintiff is entitled to, and he will be granted, a declaratory judgment that the Ordinance is unconstitutional. Plaintiff's alternative First Amendment challenges in Counts III and IV are moot.

### B. Peters

Peters contends that he is entitled to qualified immunity on plaintiff's First Amendment retaliation claim, which claim stems from his having cited and arrested plaintiff for the Ordinance violation. A state official "is entitled to summary judgment based on qualified immunity unless (1) the evidence, viewed in the light

most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Capps v. Olson*, 780 F.3d 879, 884 (8th Cir. 2015).  If the right was clearly established, then "a reasonable official would have known that [his] actions were unlawful," and no immunity attaches.  *Clayborn v. Struebing*, 734 F.3d 807, 808 (8th Cir. 2013) (quotation marks and citations omitted).

Addressing the second prong first, *see Moore v. City of Desloge*, 647 F.3d 841, 846 (8th Cir. 2011), Peters' decision to cite and arrest plaintiff implicates plaintiff's First Amendment right to free speech and his Fourth Amendment right against unreasonable seizure.  *See* U.S. Const. amends. I, IV.  "A citizen's right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'"  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 480–81 (8th Cir. 2010) (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).  Further, "[i]t is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments."  *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) (quotation marks and citation omitted).  Consequently, the inquiry as to qualified immunity is whether a genuine dispute of material fact remains as to plaintiff's claim that Peters subjected him to First Amendment retaliation, the same inquiry that applies to determine if either party is entitled to summary judgment on that claim.

"To prevail on a First Amendment retaliation claim, the plaintiff[] must show" (1) "that [he] engaged in protected activity," (2) "that the defendant['s] actions caused an injury to the plaintiff[] that would chill a person of ordinary firmness from continuing to engage in the activity," and (3) "that a causal connection exists

between the retaliatory animus and the injury." *Small v. McCrystal*, 708 F.3d 997, 1008 (8th Cir. 2013) (quotation marks and citation omitted). "Under the third prong, a plaintiff must show that the retaliatory motive was a 'substantial factor' or 'but-for cause' of the adverse action. In other words, the plaintiff must show he was 'singled out because of [his] exercise of constitutional rights.'" *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (bracketing in original) (quoting *Baribeau*, 596 F.3d at 481). "Retaliatory motive, however, may be proved by circumstantial evidence giving rise to an inference of retaliatory intent." *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008). "The causal connection is generally a jury question . . . [unless] the question is so free from doubt as to justify taking it from the jury.'" *Peterson*, 754 F.3d at 603 (bracketing in original) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). To succeed on a First Amendment retaliatory arrest claim, a plaintiff must also establish (4) "lack of probable cause or arguable probable cause." *Id.* at 602 (citations omitted).

As to the first element, defendants concede that shouting profanity at a police officer is activity protected by the First Amendment. *See id.* at 599, 602 (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987), which held that, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," and *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002), which explained that, "criticism of public officials lies at the very core of speech protected by the First Amendment").

As to the second element, plaintiff was cited for the illegal right turn and the Ordinance violation, and the two charges were prosecuted in a single court proceeding. He was ultimately acquitted of the Ordinance violation, suffering no

injury distinct from the time and effort he expended to defend against the right turn violation.  Consequently, the citation alone, which resulted in no additional adverse consequences, would not chill a person of ordinary firmness from exercising his First Amendment rights.  *See Naucke*, 284 F.3d at 928 ("[I]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise."  (quotation marks and citation omitted)).

However, being arrested for exercising the right to free speech would chill a person of ordinary firmness from exercising that right in the future.  *Peterson*, 754 F.3d at 602 (holding that "the effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable" (quotation marks and citation omitted)).  Thus, Peters' actions constituted a deprivation of plaintiff's First Amendment right to free speech for which plaintiff may be entitled to relief.

As to the third element, the question is whether Peters arrested plaintiff because of his protected speech or for some other, non-retaliatory reason.  *See Kilpatrick*, 499 F.3d at 767 (holding that whether a defendant is liable for First Amendment retaliation in part "depends upon the defendant['s] motives for making the official decisions at issue").  Peters has offered only one reason for arresting plaintiff: his assessment that there was probable cause to believe plaintiff violated the Ordinance.  *See Hartman v. Moore*, 547 U.S. 250, 260 (2006) (holding that "upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of" (citation omitted)).  "Adverse action that cannot be

defended by any non-retaliatory explanation provides a basis for a reasonable jury to find that the defendant[] acted with improper motives." *Kilpatrick*, 499 F.3d at 767; *see Hartman*, 547 U.S. at 256 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, we have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

The next inquiry is whether there was in fact probable cause to arrest plaintiff. *Hartman*, 547 U.S. at 261 ("Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for [the official's action]."). The existence of probable cause to arrest hinges on whether "the facts and circumstances are sufficient to warrant a man of reasonable caution in the belief that the person was involved in the commission of a crime." *United States v. Smith*, 715 F.3d 1110, 1115 (8th Cir. 2013) (quotation marks and citation omitted)). "'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Baribeau*, 596 F.3d at 474 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "A reasonable ground for belief means more than bare suspicion, but less than evidence which would justify condemnation or conviction." *Id.* (quotation marks and citation omitted).

Whether or not Peters had probable cause to arrest plaintiff for the illegal right turn is irrelevant. Peters admitted at his deposition that he arrested plaintiff not for the illegal right turn, but solely because he believed that plaintiff had violated the Ordinance. Further, the traffic stop ended when Peters handed plaintiff the citation for the illegal turn, told plaintiff to "drive safely" and to "have a nice

day," and walked back to his police car.  *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  ("[T]he stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.");  *see also United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008) (explaining in dicta that a traffic stop ends "once an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, [and] the Fourth Amendment applies to limit any subsequent detention or search" (quotation marks and citation omitted)).  Instead, Peters effected the arrest based solely on his suspicion and assumption that the people who exited the battery and pool stores were disturbed by plaintiff's speech. Thus, there was no probable cause.

But "[t]he qualified immunity doctrine provides protection to all but the plainly incompetent or those who knowingly violate the law.  It allows officers to make reasonable errors.  Officers are allowed considerable room for mistaken judgments.  Qualified immunity applies if there is even arguable probable cause for an arrest."  *Clayborn*, 734 F.3d at 808 (quotation marks and citations omitted);  *see Peterson*, 754 F.3d at 602 (holding that a First Amendment retaliatory arrest claim fails if an officer had even arguable probable cause to arrest).  "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable."  *Allen*, 712 F.3d at 1226 (quotation marks and citation omitted).  In turn, "[o]bjective reasonableness depends on the totality of the circumstances."  *Clayborn*, 734 F.3d at 809 (quotation marks and citations omitted).

In determining whether Peters is entitled to qualified immunity despite the absence of probable cause, the question becomes whether under the totality of the

circumstances Peters lacked even arguable probable cause to arrest plaintiff. Thus, Peters must show that his mistaken conclusion that he had probable cause to arrest plaintiff was not objectively unreasonable. Were the facts otherwise and had Peters gathered evidence that plaintiff had annoyed or disturbed the bystanders at the scene, the Court would look to whether the Ordinance, "as it existed at the time of the arrest, gave the defendant[] 'fair warning' that the arrest was unconstitutional." *Baribeau*, 596 F.3d at 478 (citation omitted). Based on the totality of the circumstances in this case, the Court concludes that Peters' stated belief that he had probable cause to arrest plaintiff for the Ordinance violation was not objectively reasonable, and he lacked even arguable probable cause for his actions.

That conclusion is compelled by the fact that Peters failed to conduct even a cursory investigation of the alleged crime. "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not be unduly hampered . . . if the agents . . . wait to obtain more facts before seeking to arrest.'" *Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir. 1999) (quoting *United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir. 1987)). A police officer "need not conduct a 'mini-trial before making an arrest, but probable cause does not exist when a minimal further investigation would have exonerated the suspect." *Id.* (quotation marks and citation omitted). S*ee also BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)(a police officer "may not close her or his eyes to facts that would help clarify the circumstances of an arrest."); *Romero v. Fay*, 45 F.3d 1472, 1476–77, 1477 n.2 (10th Cir. 1995)(police must "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a

crime has been committed at all before invoking the power of warrantless arrest and detention").

The people who exited the battery store and the pool store were the only potential victims of the Ordinance violation; Peters himself could not have been a victim since he was never fifty feet away from plaintiff. Yet, Peters did not ask any of them whether they were disturbed or annoyed by plaintiff's utterances. At best, it may have been reasonable for Peters to believe that the bystanders *heard* the plaintiff, but the Ordinance requires that the sound be annoying or disturbing, not merely audible. *Kuehl,* 173 F.3d at 651 (police officer not entitled to qualified immunity based on arguable probable cause where he had "refused to interview [a witness] despite [that person] having witnessed the entire altercation between" the offender and the alleged victim). The Court is required to give plaintiff, the nonmoving party on this claim, "the benefit of all relevant inferences at the summary judgment stage." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000). Under that standard, the Court concludes that the presence of the bystanders at the scene was insufficient to establish that they were annoyed or disturbed. Peters' failure to interview any of the bystanders belies any suggestion that he had arguable probable cause for the arrest.

According to his testimony, Peters believed he was entitled to conclude that an individual was the victim of the Ordinance violation, based solely on his "common sense," because the "victim" is the "general population." But no reasonable officer could have held such a belief. *See Kuehl*, 173 F.3d at 651.

The *Baribeau* case cited by Peters is distinguishable. In that case, the police received a complaint about the plaintiffs who were dressed as zombies and playing

loud music as part of an anti-consumerism protest. After arriving at the scene, the officers saw that the plaintiffs were carrying bags containing sound equipment. They also observed a young girl become frightened by plaintiffs' appearance. The police took the plaintiffs into custody and booked them for displaying simulated weapons of mass destruction (WMDs). The plaintiffs were released after spending two nights in jail and, ultimately, no formal criminal charges were ever filed against them. *Baribeau*, 596 F.3d at 471-472. The Eighth Circuit held that the defendants were not entitled to qualified immunity on the plaintiffs' Fourth Amendment wrongful arrest claim because they lacked even arguable probable cause to arrest the plaintiffs for disorderly conduct or possessing simulated WMDs. *Id. at* 480–81.

But the *Baribeau* court also held that the defendants were nonetheless entitled to summary judgment on the plaintiffs' First Amendment retaliatory arrest claim. *Id.* The court reached that conclusion for two reasons. First, the evidence demonstrated that the officers arrested the plaintiffs after one of the officers "claimed to have observed a young girl become frightened by the plaintiffs' appearance, which he unreasonably believed constituted 'disturbing the peace.'" *Id.* at 481. Second, the Court found "no evidence to suggest that the decision to arrest the plaintiffs . . . was not based on an actual but overly exaggerated belief that the plaintiffs violated" a statute at issue. *Id.*; *see also Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007) (explaining that a public official may escape liability for First Amendment retaliation if the official can prove "'by a preponderance of the evidence that [he] would have reached the same decision . . . even in the absence of the protected conduct'" (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977))).

Peters has not shown that it is more likely than not that he would have reached the decision to arrest plaintiff if plaintiff had been shouting something other than profanity. Further, unlike the officers in *Baribeau*, Peters neither received a complaint about plaintiff nor did he observe any behavior of the bystanders indicating they were disturbed or annoyed. Thus, in contrast to the facts present in *Baribeau*, sufficient circumstantial evidence exists here for a reasonable jury to find that Peters would not have arrested plaintiff had he not been engaged in protected speech and that retaliatory animus was a substantial factor or but-for cause of plaintiff's arrest.

The Court finds that plaintiff has established the fourth element of his First Amendment retaliatory arrest claim and that he has rebutted Peters' sole stated reason for the arrest. Thus, there exists a genuine dispute of material fact as to causation and "a basis for a reasonable jury to find that [Peters] acted with improper motives." *Kilpatrick*, 499 F.3d at 767; *see City of Carl Junction*, 523 F.3d at 843; *see also Hartman*, 547 U.S. at 256; *United States v. 3234 Wash. Ave.*, 480 F.3d 841, 845 (8th Cir. 2007) (holding that "where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, summary judgment is improper, especially when the challenged testimony is an essential element of the plaintiff's case," and that, "if the credibility of a critical interested witness is even partially undermined in a material way by the non-moving party's evidence, summary judgment in favor of the party with the burden of proof should be denied" (quotation marks and citations omitted)).

What remains then is for the factfinder to determine whether Peters had a retaliatory motive that was "a substantial factor or but-for cause" of his decision to

arrest plaintiff, singling plaintiff out for adverse treatment for exercising his right to free speech. *Peterson*, 754 F.3d at 603 (quotation marks and citation omitted); *id.* ("The causal connection is generally a jury question . . . [unless] the question is so free from doubt as to justify taking it from the jury."); *Kilpatrick*, 499 F.3d at 767. Accordingly, Peters is not entitled to qualified immunity or summary judgment, and plaintiff's First Amendment retaliatory arrest claim in Count I will proceed to trial.

### C. The City

### (1) *Monell* Liability

In Count V, plaintiff seeks damages from the City for having promulgated the unconstitutionally vague Ordinance. In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality can be liable under § 1983 if an "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. "To establish municipal liability, a plaintiff must first show that one of the municipality's officers violated [his] federal right." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Plaintiff has established this element by virtue of the fact that he was cited and arrested for activity protected by the First Amendment, pursuant to the unconstitutionally vague Ordinance.

He must next establish "the requisite degree of fault on the part of the municipality and a causal link between municipal policy and the alleged violation." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989)). "Such a showing requires either the existence of a municipal policy that violates federal law

on its face or evidence that the municipality has acted with 'deliberate indifference' to an individual's federal rights." *Id.* (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404–07 (1997), and *Harris*, 489 U.S. at 388–89).

> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. . . . [T]he conclusion that the action taken or directed by the municipality . . . itself violates federal law will . . . determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Brown*, 520 U.S. at 404–05. "To establish a constitutional violation, no evidence is needed other than a statement of the municipal policy and its exercise." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389–90 (8th Cir. 2007) (en banc) (citation omitted). Under *Monell* and its progeny the City is therefore liable for violating plaintiff's constitutional rights because it promulgated the Ordinance, the Ordinance is unconstitutionally vague, and plaintiff was cited and arrested pursuant to the Ordinance.

Where such a violation is established, a plaintiff is entitled to at least nominal damages, *Carey v. Piphus*, 435 U.S. 247, 266 (1978), the Court may award reasonable attorneys' fees, 42 U.S.C. § 1988(b), and a jury may award compensatory and other damages. *See Young v. City of Little Rock*, 249 F.3d 730, 736 (8th Cir. 2001); *see also Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding that a jury may award punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); *Schaub v. VonWald*, 638 F.3d 905, 922–23 (8th Cir. 2011). Accordingly, issue of damages in Count V will proceed to trial.

### (2)  Failure to Train and Supervise

In Count II, plaintiff alleges that the City failed to train Peters regarding First Amendment rights.  "The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014) (citing *Harris*, 489 U.S. at 388).  To establish such a claim, a plaintiff must demonstrate:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that [the] plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was a moving force behind the constitutional violation.

*Id.* (italics added) (citing *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013)).  The Court need not address the first and third elements, or the parties' evidence thereof, because plaintiff's failure to establish the second element is dispositive.

To establish deliberate indifference, a plaintiff must offer evidence that the municipality "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights."  *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996).  A plaintiff may show that a municipality had notice in one of two ways: (1) by showing that the failure to train municipal employees was "so likely to result in a violation of constitutional rights that the need for training [was] patently obvious"; or (2) by showing "a pattern of misconduct" that indicated that the municipality's "responses to a regularly recurring situation" were "insufficient to

protect" the citizens' constitutional rights.  *S.J. v. Kan. City Mo. Pub. Sch. Dist.*, 294 F.3d 1025, 1029 (8th Cir. 2002) (quotation marks and citations omitted).

One can presume that the City expects its police officers to enforce all of its ordinances.  The fact that the Ordinance in this case is unconstitutional is not a reflection of the City's training and supervision procedures.  It is instead a function of the City's misunderstanding of the First Amendment in adopting the Ordinance. Plaintiff's injury flows from the City's enactment the unconstitutional Ordinance, not from any failure to train and supervise Peters in enforcing it.

To survive summary judgment, plaintiff would have to submit evidence from which a reasonable jury could conclude that the City was deliberately indifferent to its citizens' constitutional rights when it instructed Peters and its other officers to enforce the unconstitutional Ordinance at issue.  But no reasonable jury could so conclude, because to do so the jury would have to find that the City was obligated to train its police officers to question—or even refuse to enforce—the laws that the City enacted and that the officers were being paid to enforce.  By the same measure, no reasonable jury could reach that conclusion with regard to the City's supervision of its officers, because to do so the jury would have to find that the City was obligated to direct its police officers not to enforce its ordinances if the officers believed them to be unconstitutional.  .

Because plaintiff cannot establish that the City was deliberately indifferent, his failure to train and supervise claim fails as a matter of law.  Accordingly, summary judgment will be granted in favor of the City on Count II.

### D. Permanent Injunction

In addition to damages and a declaration that the Ordinance is unconstitutional, plaintiff seeks a permanent injunction barring enforcement of the Ordinance.

> A court must consider the following factors in determining whether to issue a permanent injunction: (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest.

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003), and citing, among other cases, *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

As to the first factor, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). In the absence of a permanent injunction barring enforcement of the Ordinance, the free speech rights of the plaintiff and other citizens would continue to be curtailed. Second, the issuance of an injunction would cause little or no harm to defendants, because defendants have no significant interest in the enforcement of a regulation that contravenes the Constitution. Any interest defendants have in noise reduction, moreover, can be achieved through regulations that comport with the Constitution. *Cf. Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984). Third, plaintiff has succeeded on his claim that the Ordinance is unconstitutional. *Cf. Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) ("When a plaintiff has shown a likely violation of his or her First Amendment

rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." (quotation marks and citation omitted)). Finally, "it is always in the public interest to protect constitutional rights." *Amos v. Higgins*, 996 F. Supp. 2d 810, 814 (W.D. Mo. 2014) (citation omitted).

Therefore, the Court concludes that it is appropriate to issue a permanent injunction barring enforcement or threatened enforcement of the Ordinance.

## IV. Conclusion

For the reasons discussed above, the Court concludes: (1) Peters is not entitled to qualified immunity on plaintiff's First Amendment retaliation claim in Count I, and a genuine dispute of material fact precludes summary judgment on that claim; (2) the City is entitled to summary judgment on plaintiff's failure to train and supervise claim in Count II; (3) plaintiff is entitled to summary judgment on Count V, because the Ordinance is void for vagueness; (4) plaintiff's First Amendment challenges to the Ordinance in Counts III and IV are moot; and (5) plaintiff had established that a permanent injunction barring enforcement of the Ordinance should issue. This case remains set for a jury trial with respect to plaintiff's First Amendment retaliation claim against Peters and plaintiff's claim for damages against the City.

**\* \* \* \***

**IT IS HEREBY ORDERED** that the parties' cross-motions for summary judgment [Docs. ##20, 23] are **granted in part and denied in part** as set forth above.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of February, 2016.